Before we turn to the case for this afternoon, I'll turn to Judge Quaker who has the motion. We have a matter of an admission not against interest, but actually much more in our interest. When judges hire law clerks, we can be pretty sure they are going to be smart and usually able. But we're not always sure they're going to be dedicated and devoted and hardworking the way we think they should be. And it's a delight for me today to move the admission of a young man who has served me in my chambers for the past year. And I've been fortunate over the years, I'm not even going to say how many, in having some really outstanding people serve as law clerks, and Dan Cooley fits right among that group of the best law clerks you could imagine. So I am delighted this afternoon to move the admission of Daniel Craig Cooley, who is a member of the bar in good standing of the Supreme Court of Virginia. I have knowledge of his credentials and am satisfied that he will possess the necessary qualifications. So move. Not a fair person. And I enthusiastically grant the motion. We two at the court all get the opportunity to get to know each other's clerks. And I've had that pleasure with the step to Dan. Absolutely. Great. Right on. Do you solemnly swear or affirm that you will support yourself as attorney and counsel of a court of the law and that you will support the Constitution of the United States of America? I do. Do you solemnly swear or affirm that you will support yourself as attorney and counsel of a court of the law? Congratulations. Yes. And don't take it to your head. You're saying it. I'd just like to also say briefly that I think on behalf of Judge Plager, but at least for myself, this is the first time I'm sitting with one of our newer judges. Not our newest, but one of our newer. And what an honor it is to share the bench with him and what a delight it is to have him here at the court. Thank you, Judge. It's not my first time, but I share that field. And it's good to see you again, Judge Plager. The case this afternoon is 13-1406, Takeda Pharmaceuticals v. Zydus. Mr. Moore, whenever you're ready. Thank you, Your Honors. May it please the court, my name is Steve Moore and I represent Zydus and Cadillo Healthcare in this matter. What we have here is a tale of a company who looked at the patent specification and its file history, as well as the file histories of its parent and progeny, which have the same specification, and then decided to make an orally disintegrating tablet of lensoprazole, utilizing granules which were explicitly disavowed and said to be conventional in the patent. What we have here also is a tale of a district court which erroneously ignores the intrinsic evidence of the patent and claim construction, instead relying upon post-dated extrinsic evidence that causes all sorts of havoc, including the claims to read on the disavowed species. One of your strongest arguments is obviously with respect to the claim language, which just has the number 400 and not more or less, etc. But isn't it not fair to say that when we have that kind of language which just cites the number in the claim, there's some give on either end of that number and we determine how much give there is by what one skilled in the art would have thought? Well, I think what you have to look is at the specification, and the specification at column... You mean the written description? The written description, yes. I'm sorry. The written description. You're right, because I would have kind of gave it to you on the claim. I got it on the claim. I'm sorry. All right. That's good. Let's look at the written description at column 2, and you've got lines 12 down to 22. And what you have here is a definition of what is a conventional granule, and what is a fine particle under this invention. And what you can see here is that they define granules having a large particle diameter as being conventional, and that's 400 microns or more. Notice there's no about there. It's 400 microns or more. Then later they talk about, you don't want those, because those are what's going to produce this roughness in this mouth and what later is said to be our discomfort orally, which is at line 62 of that same column. So you don't want those things, and we have a new invention. And what our invention is, you have to have a particle diameter that includes granules that must be about 400 microns or less. And the whole thing with the Judge went on was this word about. But when you look at this, you have two distinct definitions. They are using 400 as their dividing line between conventional granules and non-conventional. About 400 could be 39.99, 39.8, but it's very clear in this patent that they're always talking about something below that number. So what is your position on how to understand the claim? I mean, I've heard, I hear 1%, 3%, 10%. Where are you? Where is your client? Our honest answer has always been, read the specification. The intrinsic evidence is really clear. It is 400 is the dividing line. 400 or above is conventional granules. Otherwise, you're going to read into these conventional granules that are specifically disavowed, specifically said to be bad. Where did the plus 3 or minus 3% come from? We just gave in because of our, we know that there is some give on these machines. Okay, we said, even though we think that this particular patent reads the way it is, we will say, for laser diffraction, it's about plus or minus 3%. And actually, the 1999 ISO document, which they cite themselves, says it's no more than 3%. Was that an alternative argument? I don't quite follow. It is an alternative argument. It's an alternative argument in the sense that I think that the patent specification is clear, because you don't want to have disavowed granules in your level. And you had yet another alternative argument of plus or minus 1%? I'm not sure we're on plus or minus 1%. I don't think we've ever went to plus or minus 1%. Okay. I'm troubled by your, if I remember your language, it was precisely. Wasn't that what you argued for? Precisely. We, the 400, nothing is that precise. And in fact, if you look at column 6 of the patent line 4, it says, practically as used in the particle diameters, practically 425 microns or less, in the particle diameters, practically 400 microns or less, means that the particles may include a small quantity, about 5, 8% or less, of particles whose particle diameter is out of the above described range to include the inevitable contaminant particles. They're taking into account the manufacturing process. And when you argued for precisely, I think you may have upset the trial judge's thinking that you weren't going to give any give at all, but you eventually did. Right, because precisely would involve to a scientist the concept of there's a little give in the machine. And that's what it means to a scientist. Not to a linguist, but to a scientist. To a scientist, that's what it means. I have to meet a scientist. Okay. So you have a laser diffractor, and laser diffractors were clearly, back in those days, at least as good as plus or minus 3%. Plus or minus some small... Well, less. And I shouldn't say plus or minus. There is no such thing as plus or minus. It's always been 3% is the max. The plus or minus is something they brought into this whole case, which makes no sense. What does that mean? Are you saying that if you use the laser diffraction method, and you come up with a particle size diameter of 412, that even though the measured value is 412, that farewell could be falling within the claim language of 400 microns or less? If you're going to give for the machine, that's the most that you can give. But if the answer is yes or no, am I understanding it correctly? At the very best. What's a plus or minus 3, how it operates? Yes. Well, it's not a plus or minus. And I misspoke when I said plus or minus. It's 3% is the maximum allowed. So what claim construction are you here advocating? We do advocate that the claim construction would be, as this patent says, they actually divided the world into, otherwise you get complete confusion. They divided the world into what is a conventional granule, which will cause roughness in the mouth, and what is not a conventional granule, which is supposedly the granules of this. The conventional granule is defined as 400, right? It's defined as 400 or more. And the fine granules of this invention are defined as less plus. They put on the maximum size of these particles to be 425 microns. Now, why do you have to do that? Because if you have a median, you have an infinite number. Any granular population, if you say I have a median of X, you have an infinite number of granular populations. The only way you can control that is by putting a number on the top. And that's indeed what they did. They said that the maximum particle size could be 425. Now, why don't you need that in the conventional? Because you're just saying everything above that is no good. Can I ask, and just logistically, if we were to agree hypothetically with you on the claim of construction, does that end the inquiry with regard to infringement? I mean, I'll ask your friend as well, whether or not there remains a dispute of infringement. No, definitely it would end it, because no matter how they want to measure it, cutting granules apart in the virtual world or not, we're always above... What about the invalidity claims? Do they sort of drop out, or do you continue to press those, given I assume they were counterclaims and not defensive? That's correct, but the reality is these claims are invalid. I mean, the simplest one is to look at the ELR... What's your best shot at invalidity? That's where I'm having a little trouble. It's not clear to me exactly what is wrong... Putting aside the whole question of infringement and claim construction, to get all of that for the moment, what exactly is wrong with the patent that makes their claim invalid? Well, there's two points that are to be made. One is that they've said that any method under the sun... And they can try to go back from that, but they said any method under the sun can be used to measure these granules. Well, all of these methods give you very different numbers. Wait a minute. All of these methods? The only method that's really been talked about was the laser method, and then the microscope. And if you look in our briefs, it tells you that they say you can use culture counter, you can use analytical sitting... There's no evidence in the record, I think, on all of those different methods. Why isn't it true that any method could be used as long as it came out with numbers that were basically the same as the numbers the inventors used, the laser? If they came out the same, but they won't. As the Rawls article that's cited in Dr. Meierstaudt's expert testimony says, there's an infinite number of possibilities. And he says, Rawls... Let's just stop for a second. Is there any evidence where the very same tablet was broken up and measured, and using two different measurement methods came up with very great disparities in measurement numbers? No, that comes from the expert testimony and from the data that... the articles that they've applied. So, is the answer no or yes? In terms of, did we do it? Did anybody do it? Nobody did it. Then how can you say that, well, you're going to get wildly different results based on using different measurements? Because it's well known in the field that these methods will give you different times. And, you know, I'm watching my time here, and I'm over, and I would appreciate if I could... But isn't that key to the agglomeration issue? It is key to the agglomeration issue in the sense of what they did. I don't know if... Clearly, the key to the agglomeration issue is look at what they did. They measured via laser diffraction every granule that they got after they went through that screen. Every granule includes, as the USP section on optical microscopy says, hard agglomerates, because hard agglomerates are particles. I'm sorry, but... No, you can finish the answer. Okay. Okay, and that's really the reality, is that what they did is... And what they did is not even supported by even the manuals that they used. They keep taking this word stuck out of context. If you look in the manuals, you'll see that the word stuck at JA8187 is defined in the Silas manual as something that is touching or interacting, like van der Waals interactions, charge-charge stuff. They're talking about you break those apart because it makes sense. Those things are two separate things. A different issue than the validity issue. I mean, that could be knocked out, for instance, in the connection with infringement. We could say there's no infringement assuming we buy the discipline point instruction because they can't do this method, use this virtual method. So we could construe the patent as not allowing for that method. That doesn't get you into the door. No, no, if you say that it was only supposed to be laser diffraction, that's what they argued to get their claim construction was on laser diffraction variability. As you know, this variability for each method is different. If they stuck with that, then yes, there wouldn't be a validity issue on that end. Although we still have a written description problem. May it please the court. Arlene Challis, Hogan Lovells, on behalf of the Takeda appellees. The court properly construed the claim construction to incorporate a plus or minus 10% deviation. Where does the 10% come from? Your Honor, in the context of particle size determination for pharmaceuticals, a person of skill in their art would know that the applicable deviation is plus or minus 10% because. What is the evidence? That tells us that. I appreciate your point as an argument. But what's the evidence for it? The prevailing scientific authorities, the US Pharmacopeia, which is a standard setting organization for the pharmaceutical industry, as well as the PCRI, which is a collaboration between FDA, FDA Academia, as well as the pharmaceutical industry. These are publications. Those are publications, Your Honor. Were they in print at the time this application was filed? Those publications reflected the standards that were known in 1999. Were they in print? Answer my question. No, Your Honor. Thank you. They came up sometime later, didn't they? They did. But, Your Honor, the record reflects the fact that those standards were in place in 1999. We had, as our expert witness, Dr. Byrne. And he was very credible in this regard because he was the chair of the PCRI committee that supervised the SNORC committee that issued, in its publication, the plus or minus 10% deviation. Can you point to anything in that patent that supports a 10% number? Your Honor, the patent is very clear. Can you point to anything in the patent that supports the number 10%? The fact that... Answer yes or no. Yes, I can.  The term about... Give me the column and the line. I'm ready. JA-126. What column? Yes, column 5. Column 5. Yes. Lines 57 through 62. In this key passage, in quotes, you see the disputed claim limitation. And what it states is, where of 400 microns or less, has an average particle diameter of about 400 microns. And that term, about, Your Honor, is very significant. I didn't know about was spelled T-E-N. That's very interesting. Can you point to anything in the patent that says 10%? The answer is no. Come on. We all know what's in the patent. You know what's in the patent. We know what's in the patent. The 10% was a number. Where did that number come from? From the understanding of persons of skill in the arts at the time, Your Honor. But the 10% is really based on the notion that the instrumentation for making these kinds of measurements is not precise, right? And it's more due to the inherent imprecision of the measurement using that particular measurement tool. No, Your Honor. There's a difference. The 3% reflect small instrumental errors. Okay, so the 10% also includes, I guess, what, preparation of the sample and things like that? Indeed, Your Honor. The 10% reflects variance in the real-world setting where there are different users, different instruments, where the actual material is not perfect sphere. And so why doesn't all of that just go into the standard of proof of infringement and not get all shoveled into understanding what is the proper scope of the claim? The claim is pretty clear. It's about as clear as it can be when it says 400 microns or less. And then the question is, okay, does the other side fall within that, all right? You have to take a measurement of their granules and their particle sizes, and then maybe there's some imprecision in the instrumentation. Well, now, that's a proof question, isn't it? It's not a claim construction question. I think under these circumstances, where the patent allows for imprecision, where it recognizes that there is imprecision in particle size determination with the term about, and where persons of skill in the art understand that that deviation is plus or minus 10%. Has there ever been a case where we've folded into the claim a claim parameter, the fact that maybe the measurement process is just not precise, that we factor that into the understanding of the claim terminology? I don't know if there has been a case where you have the evidence here, where in the specific context of pharmaceuticals and particle size determination, you have materials which reflect what is the understanding of persons of skill in the art. Here, the standard is plus or minus 10%, and that is still the standard today. That is what applies, and that is why the term about... There's no evidence it was the standard at the time this application was filed, and that's the relevant time. I interrupted you, and I apologize. When you were giving your answer to where the 10 came from, you pointed to the phrase particle diameter of about 400 micron or less. Is that right? That's correct. Now, where in the claim does that phrase appear? It does not appear in the claim, but in the passage of the specification, where that particular claim... By specification, you mean the written description? Yes, yes. Not the claim? Not the claim. The written description. Yes. Thank you. But in the portion of the passage that I directed you to, where the claim limitation is repeated in quotes, the term about appears when the inventors are defining what is meant by the claim limitation that appears in quotes. We would have to read into that claim, then, the phrase about 400 microns. Is that your argument? Because the inventors have defined it as such, Your Honor. So you're saying that we ought to import into the claim material from the written description? I'm saying that the written description... Is that what you're saying? No, Your Honor. I'm saying that the written description makes clear that of 400 microns or less is equivalent, equal to, about 400 microns or less. That is my argument. One further problem I have with that, does the word about appear in Claim 1? No, Your Honor. Yes, it does, Your Honor. If you will look at Claim 1, you will see the word about appears towards the end. You can look at column 37, line 53. It says, An additive wherein said tablet having a hardness strength of about 1 to about 20 kilograms, I guess kg is kilogram, is orally disintegratable. That suggests they knew how to say about in the claim, but they didn't say it for your measurement. I'm puzzled. And yet, and yet, Your Honor, in the specification, in the written description, when they define what is meant by what is stated in the claim in quotes, they use the term about. And that is consistent with the understanding of... So your view is that every time they refer to the phrase in the written description, 400 microns, we should put an about in front of that, correct? That's correct, Your Honor. What about in column 2, where we're referring to 400 microns or more of an average particle diameter with regard to defining what's a large particle diameter. So we should say large particle diameters are run between 360 and 440. That's how we define a large particle diameter. In that, when you see the 400 microns, yes, there is a plus or minus 10%, Your Honor. That is our argument. To be clear, in that passage in column 2, the patents define what is within the scope of the invention. That is about 400 microns or less. Thus, the fine granules are 440 microns or less. The conventional granules are very clearly what the fine granules are not. And our position is that means that they are 440 or more. So the dividing line, Your Honor, between fine granules and conventional granules is 440. What matters, Your Honor, is that the patent is very clear as to what is encompassed by the claim, what is encompassed by the invention. Conventional granules are what they are not. And indeed, in the background art section, you would see, by way of example, there's a piece of prior art where the granules were 500 microns or more. If we were to read the word about from the spec into your claim like you'd like us to, then I don't know if we could stop there. I think we'd have to keep going and then also read into the claim an understanding of about intrinsic evidence from the written description where in the next paragraph it talks about how the maximum particle size has to be practically 425 microns or less, i.e. 95% of the particles have to be 425 microns or less. That, the intrinsic evidence, gives us some indicator of what about could mean. That's the only thing that we could grasp as to what the word about could mean. Your Honor, the patent makes very clear that maximum and medium particle diameter are two distinct concepts. And indeed, Your Honor, that was undisputed. The record is undisputed. Both experts agreed that maximum and medium diameter are two distinct concepts and Claim 1 and Claim 7, those two claims reflect that fact. Your Honor, Zeidis is attempting to collapse those two concepts together and yet the record is unambiguous that they are distinct. If we were to reject your view of claim construction, does that end the infringement analysis as well? No, Your Honor. Because if you were to reject our argument and incorporate a hard cutoff of 400 microns, because we had tested and our numbers were 420 in relation to Zeidis' product, the determination would be remanded to the court for doctrine of equivalence, for infringement pursuant to the doctrine of equivalence. So no, this case would not be over. Yeah, but your 420 arrives, testing of their product, you arrived at that through this de-agglomeration and using microscopy. That's correct, Your Honor. And that assumes that that is a valid mechanism for evaluation under this patent. Nowhere as near as I can go, and you know the record a lot better than I do, but nowhere can I find a reference to the need for de-agglomer... Well, you know what I mean. Your Honor, the patent supports the fact that... De-agglomeration is implicit to answer your question, Your Honor. The patent supports the fact that a person of skill in the art would treat each individual coded core as a fine granule. It is significant that in the patent a granule is always described as a single core, never more than one. Indeed, the phrase granules having a core appears 89 times. Also, the record... Wouldn't one of skill in the art understand that when you mush all that stuff together, you're going to get perhaps a nominal, whatever that means, number of double cores? And then the question is, how do you measure those? And there's nothing in the patent that I can find that says, ah, when you have anything that has a double core, you have to de-agglomerate it and then go to a different mechanism for testing it. Have I missed, again, something in the patent that's there? Your Honor, it is clear that the inventors had nominal agglomeration because it makes sense that an exemplary batch by the inventors would conform with the goals of manufacturing, where there would be minimal agglomeration. Which is why you talk about an average micron value. I think that's... Well, that is different from the determination of whether or not you will de-agglomerate, Your Honor. I don't understand. Isn't the actual size of the particle, irrespective of how many cores it's comprised of, what is really relevant in this patent with regard to fine granules? Because we're talking about decreasing the harshness of the roughness of the mouth, right? And that has to do with the size of the particle. Your Honor, roughness of the mouth is not a claim limitation. It is an abstract purpose of the invention. And it certainly does not render the coarse determination of de-agglomeration clearly erroneous. The record reflects the fact that a person of skill in the art would know to de-agglomerate individual cores that are... But that's not what happened in the intrinsic evidence of the written description. You've got multiple examples where you make up these granules and you've used laser diffraction every single time, and then just using laser diffraction, you immediately go to the measurement and report the measurement, and there isn't any notion in any of those examples in the patent that shows this act of virtual cutting. The record reflects, Your Honor, that a person of skill in the art knows to inspect the sample prior to selecting the appropriate particle size method. That's in the Snorek article at 8250. I think the point I have here is that the patent itself talks about a particular method of measurement, laser diffraction. It doesn't talk anything at all about this new word called de-agglomeration. And it just seems to me it would be very odd to say that a competitor, having read that patent, couldn't use the very measurement method that's disclosed in the patent to figure out what is the appropriate or what is the correct size of their granules. Your Honor, it is undisputed that optical microscopy is a standard particle size testing technique. Now, the patent makes it very clear that laser diffraction is an exemplary method. It is not the only method. A person of skill in the art would bring... But it's an appropriate method, right? Why isn't it an appropriate method here? It is appropriate where there are minimal agglomerates. When a pharmaceutical company is enabled... Does anything in the patent describe how you make the decision when it's appropriate? In other words, will you make the cutoff? You just said it's appropriate when there are many. Yes. Is there anything in the patent that describes how you go about differentiating and when you go about differentiating how many there are? It doesn't need to, Your Honor, because a person of skill in the art comes to this patent with knowledge of particle size determination. That is a very standard technique. And that is why the Snorek article, which lays out the standard particle size techniques, is so significant. There are known techniques persons of skill in the art know to resort to them. They know when to use laser diffraction. As Judge Chen was alluding to, one looking at this patent would say, well, it's an example, but the only example they have is laser diffraction, laser, whatever it's called. And now you're saying you can yield appreciably different results by doing this other method that's not even referenced in the panel, a different result so that there'll be infringement if you use what's referred to in the panel, patent, and there'll be infringement if you use some other measurement device, but not if you use the measurement device in the patent. The patent makes clear... Is that, yes? Is that the way it would turn out then? No, Your Honor. It's dependent on whether or not there are problems. The patent makes clear that what needs to be measured are the individual coded cores. Those are fine granules. A person with skill in the art knows that part of particle size determination, part of it includes de-agglomeration. That is what the record reflects. So when a person with skill in the art inspects a sample, when it sees agglomerates, it knows to use a different standard technique. The U.S. Pharmacopeia... Wouldn't anyone reading this patent know that what we're talking about here is decreasing the roughness in the mouth, and that has to do with the size there, and that has nothing to do with how many cores it's comprised of? A person with skill in the art would know that there's a very clear boundary spelled out for persons with skill in the art. Do those fine granules, do those individual coded cores, have a particle size diameter of specified size? If this claim included a limitation of roughness in the mouth, I would be here today arguing, against Zytus' argument, that the patent is indefinite. That is an abstract purpose. To the contrary, the patent defines a very clear boundary, Your Honor. Which is 400. Which... Mr. Moore is probably going to argue that his average size in his amended ANDA was 450, and that your evidence that 420, based on the little sampling that was done, means he's free and clear. Why isn't that true? Assuming, hypothetically, that we disagree with 10%, or some other freedom. Because Takeda's testing of the individual coded cores in Zytus' product was 420 microns. It is conclusive proof, Your Honor, that Zytus' amended ANDA does not resolve infringement. And indeed, Your Honor, Zytus did not submit any test results to the contrary. It is our testing against their specification. That specification is flawed, we submit, because it does not allow for de-agglomeration, which is necessary when one is dealing with fine granules, which are defined as individual coded cores. Okay. I think we have your argument. Thank you. Thank you. Mr. Moore, since we went over a little, we'll give you a couple more minutes in addition to the two and a half you already had. Thank you, Your Honor. Your Honor, I just want to mention first, roughness in the mouth is the invention. The counsel actually even said it at Markman, that it was the invention. It is the invention. They don't want particles causing roughness in the mouth. Well, your friend is right. It's not an acclaim. It's not something that's claimed. The question is not whether it's the invention, but whether it's probative in terms of what the measurement is and on what basis you draw the line. Do we have a gallery gentry situation here? And I say that we do have a gallery gentry case here, because what you have is this is the objective. This is the running part to this entire invention, as admitted at Markman, is to not have this roughness in the mouth. How do you avoid sending it back on DOE, even if we agree with you on the claim of construction? Because I believe the specification is so overly clear that you have a demarcation. You can't be getting... First of all, if we're at 420... So you're making an initiation argument with respect to DOE? Well, we're at 421. Your maximum... That's your D50. That means 50% of your particles, even if you follow their... I'm sorry to use the word concocta way of cutting these things apart. 421, if that's the number, that means half of our particles are above 421. You've got a situation now where that means the vast majority of your particles are above 425. 425 is the maximum. It gives you a little leeway. You cannot do the math to get where they want to get to. And we totally disagree that was not disputed on the record. We have always said... I mean, any rational person reading aside from this, they're defining the fine granules. We're not talking about another set of fine granules. This is 440 is the D50 plus 425. And anybody rationally in the science or engineering arena would know you have to limit this stuff if you just have a median you're defining. And they don't do de-agglomeration. They're not breaking these things apart. This is all virtual. This is all made up. This is not the real world. And they're even looking at the wrong granules. They're taking them out of the tablet. And if you read the specifications, nothing in that specification ever teaches you anything about particle size other than in the pre-granulation granules such as in Eli Lilly. We have focused much of our attention and particularly in our debate with Ms. Chu on what the patent has in it. But the trial judge also heard expert testimony, heard your expert and I assume her experts also. And the trial judge came up with a significantly different analysis than you're now telling us. Don't we have to give the trial judge some credit for having heard the witnesses and judge them accordingly? We'll find out from your case law. I'm sorry. Whiting Dallas. But my answer to this is that this is all intrinsic evidence. What we've had is a situation where the district court went completely awry by not following the intrinsic evidence and is listening to an expert saying, okay, I'm going to listen to what he tells me because he knows better. The patent is clear. There's not even a question in this patent. Large particle diameters, you just heard Ms. Chu saying, oh yeah, well large particles can go from 360 to 440. That makes no sense. That's what a plus and minus means to any engineer or any scientist. This idea that Dr. Bugay came up with, if somebody gave you a loan of $10,000 plus or minus 10%, he'd know he had more money than enough and stuck it in his pocket. Plus or minus means to a second grader, plus or minus. And the district court can't change the definition. If we let a district court, this will be the first time I've heard of an all case law where a district court changes an explicit definition in a specification. He can construe a claim, but he can't change the specification. And by the way, 3% does include all error in those references that we're talking about. If you look at the ISO 1999, this plus or minus 10% for the three samples, that's based on three samples. We take nine samples. If they understood what a, and their expert understood what a coefficient of variation is, it's over the square root of n. So the more samples you're taking, the lower that number comes down. And this relates to bulk sampling. What they're talking about is in batches, massive batches. These guys are taking all different things from the claim. Thank you. We have the argument. The case is submitted. We thank you. Thank you, Your Honor. All rise. The article of court is adjourned until tomorrow morning at 10 AM.